NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| MED ALERT AMBULANCE, INC., | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 04-1615 (JAG) |
| v. | : | |
| | : | **OPINION** |
| ATLANTIC HEALTH SYSTEM, INC., | : | |
| ATLANTIC AMBULANCE CORP., | : | |
| NEWTON MEMORIAL HOSPITAL, and | : | |
| DOES 1 through 10, inclusive, | : | |
| Defendants. | : | |

---

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion for summary judgment by Defendants

Atlantic Health System, Inc. ("AHS") and Atlantic Ambulance Corporation ("AAC")

(collectively, "Defendants"), pursuant to FED. R. CIV. P. 56.[1]  For the reasons set forth below,

Defendants' motion will be denied.

## BACKGROUND

**I.    The Parties**

Plaintiff Med Alert Ambulance, Inc. ("Med Alert") was a private ambulance services

company that operated primarily in Sussex, Morris, and Warren Counties from 1984 to 2004,

---

[1] Defendant Newton Memorial Hospital did not join in this motion.  Plaintiff settled its
claim against Newton, and, therefore, the sole claim against Newton was dismissed with
prejudice and without costs by stipulation and order, dated December 15, 2005.

1

when the company went out of business.  (Plaintiff Med Alert Ambulance, Inc.'s Response to

Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl.'s Undisputed Facts Response")

¶¶ 7-8, 10.)  AHS is a non-profit health care system, with its principal place of business in

Florham Park, New Jersey.  (Pl.'s Undisputed Facts Response ¶ 1.)  AHS operates three hospitals

in New Jersey: Overlook Hospital ("Overlook") in Summit, Mountainside Hospital

("Mountainside") in Montclair, and Morristown Memorial Hospital ("MMH"), in Morristown, a

tertiary care facility.  (Id.)  As a tertiary care facility, MMH provides advanced specialized

treatments and services.  (Id. ¶ 47.)  Atlantic Ambulance Corporation ("AAC") is an ambulance

services company incorporated by AHS in August 2001.  (Id. ¶¶ 4-5.)

## II.    The Ambulance Services Business

Med Alert worked primarily with Specialty Care Transport ("SCT").  SCT consists of

transports of critically injured or critically ill patients by a ground ambulance vehicle.  (Pl.'s

Undisputed Facts Response ¶ 12.)  SCT ambulance services are necessary when a patient's

condition requires that ongoing care be furnished by one or more health care professionals during

the transport.  (Id.)  SCT usually takes place between a sending hospital and a tertiary care

facility.  (Id. ¶ 13.)

SCT differs from Basic Life Support ("BLS") transport services, which are basic

transports by ground ambulance vehicles with the provision of medically necessary supplies and

services.  (Id. ¶ 16.)  The level of care needed by the patient dictates whether SCT or BLS

services are requested.  BLS services are not a substitute for SCT services.

III.   **Med Alert's Business with Newton, Saint Clare's, and Hackettstown**

In 2000, Med Alert renewed a contract, signed on July 1, 1999, whereby Med Alert was made the "primary" provider of SCT services, with Newton Memorial Hospital ("Newton"), a community based hospital ("CBH") based in Newton, New Jersey.  (Declaration of Kate Concannon ("Concannon Decl.") Ex. 8 (Contract between Med Alert and Newton, dated July 1, 1999) ¶ 2; Pl.'s Undisputed Facts Response ¶ 28 (indicating Newton's information).)  The new contract provided for Med Alert to perform "all critical care transports into and out of Newton Memorial Hospital health care facilities [and] at least 80 percent of all the [Newton] transports." (Concannon Decl. Ex. 9 (Contract between Med Alert and Newton, dated November 1, 2000.) Pursuant to these contracts, Med Alert performed 99% of the SCT runs between Newton and MMH in 1999, 87.5% of those runs in 2000, 59.5% of those runs in 2001, and 82.2% of those runs in 2002.  (Pl.'s Undisputed Facts Response ¶ 29.)

Saint Clare's ("St. Clare's") is a health care system that operates community based hospitals in the New Jersey communities of Boonton, Denville, Dover, and Sussex.  (Id. ¶ 39.) Med Alert had a series of ambulance services contracts with St. Clare's dating back to 1997.  A contract was in place between Med Alert and St. Clare's in 2000.  (Id. ¶ 40.)  St. Clare's created its own ambulance services sometime between 2000 and 2002.  (Id. ¶ 43.)

Hackettstown Hospital ("Hackettstown") is a CBH located in Hackettstown, New Jersey. Hackettstown, like Newton and St. Clare's, discharges patients to tertiary care facilities, like MMH, when more advanced care is necessary.  (Id. ¶ 45.)  Med Alert never had a formal ambulance services contract in place with Hackettstown.  (Id. ¶ 46.)

3

**IV.**     **AAC's Entry into the SCT Market and Allegations of Wrongdoing**

AHS entered the ambulance services business in 2001 with the creation of AAC.

Corresponding with the timeframe of AAC's entry into the market, Med Alert, and other SCT

competitors, experienced sharp declines in the number of runs they provided.  (Declaration of

Patrick A. Gaughan ("Gaughan Decl.") Ex. C (Report by Patrick A. Gaughan, Ph. D. entitled

"An Updated Supplementary Analysis of the Markets in Which Med Alert Ambulance Inc,

Operated" dated November 3, 2005 ("Gaughan Supplemental Report")).)

Plaintiff alleges that this sharp decrease in competition and business was the result of,

inter alia, a tying arrangement[2] whereby MMH conditioned the availability of tertiary care,

specifically beds for patients needing tertiary care, on the use of their ambulance company, AAC,

for SCT.  Plaintiff further alleges other actions which it deems, "dirty tricks," employed by

MMH and AHS to 1) disrupt the contracts between Med Alert and St. Clare's and Newton; and

2) eliminate competition in the SCT markets.  These allegations are discussed more fully below.

**V.**     **The Instant Motion**

Plaintiff filed a fourteen count complaint on April 5, 2004.  Counts I and VI allege

violations of Section 1 of the Sherman Act and the corresponding New Jersey antitrust statute,

N.J. STAT. ANN. 56:9-3.  Counts II through V and Counts VII through X allege violations of

Section 2 of the Sherman Act, and the corresponding New Jersey antitrust statute, N.J. STAT.

ANN. 56:9-4.  Counts XI, XII, and XIII allege tortious interference by AHS in the contractual

relationships between Med Alert and Newton and St. Clare's and the business relationship with

---

[2] "Tying exists where a seller conditions the sale of one good (the tying product) on the
buyer also purchasing another, separate good (the tied product)."  Brokerage Concepts, Inc. v.
U.S. Healthcare, Inc., 140 F.3d 494, 510 (3d Cir. 1998).

Hackettstown.  Count XIV asserts allegations against Newton.  This claim was settled between Newton and Med Alert on or about December 5, 2005.

Defendants filed the instant motion on September 20, 2006, challenging all the remaining Counts of the Complaint.

## LEGAL STANDARD

### Summary Judgment

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the

moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

## ANALYSIS

### I.    Initial Matters

In their reply brief, Defendants challenge several of the declarations used in Plaintiff's opposition papers as nonconforming with Rule 56(e), and, therefore, subject to this Court's disregard.  This Court analyzes the challenges to admissibility only where the declarations are utilized in this Court's consideration of the motion.

The New Jersey Antitrust Act, under which Counts VI through X are brought, expressly provides that it shall be construed in accordance with governing judicial interpretations of comparable Federal antitrust statutes.  N.J. STAT. ANN. 56:9-18.  This Court's analysis of Counts I through V, under the Federal antitrust statutes, applies equally to Counts VI through X, which allege claims under the New Jersey Antitrust Act.

### II.    Tying Arrangement Under Section 1 of the Sherman Act

In Counts I and VI, Plaintiff alleges that Defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, which generally outlaws "[e]very contract . . . in restraint of [interstate or international] trade or commerce."  Specifically, Plaintiff alleges that Defendants created an illegal "tying" arrangement, whereby patients and hospitals in Northwest New Jersey who sought tertiary care services from MMH were required, in order to obtain those services, to use AAC as the SCT ambulance service.  Defendants argue that Plaintiff cannot prove a tying arrangement because Plaintiff has failed to establish a relevant product or geographic market.  Defendants further argue that Plaintiff cannot show coercion or a formal tying arrangement.[3]

---

[3] In footnote 8 of Defendants' brief, they argue that Plaintiff also failed to demonstrate that this tying arrangement had a substantial effect on interstate commerce.  Plaintiff disputes this argument.  The tying arrangement did affect interstate commerce because Med Alert's SBT

"Tying exists where a seller conditions the sale of one good (the tying product) on the buyer also purchasing another, separate good (the tied product)." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 510 (3d Cir. 1998); see also Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958) (A tying arrangement is "an agreement by a party to sell one product[,] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."). A tying arrangement can give rise to liability under the Sherman Act under a per se theory or under the rule of reason theory. See Brokerage Concepts, 140 F.3d at 510.

"Per se liability exists where the defendant is found to have appreciable market power in the tying market." Id. (citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 15-18 & n. 25 (1984), abrogated on other grounds by Illinois Tool Works, Inc. v. Independent Ink, Inc., 547 U.S. 28 (2006)). Where appreciable market power is found in the tying market, "the ability to leverage this power to restrain trade in the tied market is presumed and no inquiry need be made into the actual prevailing market conditions in [the tied] market." Id. (citing Jefferson Parish, 466 U.S. at 15-18). If no appreciable market power can be shown, the "inquiry into the tied product market cannot be avoided, and the plaintiff . . . has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market." Id. (citing Jefferson Parish, 466 U.S. at 29).

Before analyzing the various theories of tying arrangements, this Court must determine

---

ambulance runs were often covered by private insurance companies with out-of-state headquarters, or by Medicare or Medicaid. (Gaughan Decl. Ex. B (damage study showing $900,000 in lost profits damages for Med Alert).) Further, Rural Metro, a company which offered SCT services in the relevant markets, and was eventually forced from the market, is headquartered outside of New Jersey.

whether Plaintiff has produced sufficient evidence of a formal tying arrangement to create a genuine issue of material fact.

A.      Tying Arrangement

To support its assertion that AHS conditioned the availability of beds, and tertiary care, (the tying product) on the use of buyers of its SCT services (the tied product), Plaintiff sets forth the testimony of three nurses.[4]  (Declaration of Ralph C. Hofer with Exhibits in Support of Med Alert Ambulance, Inc.'s Opposition ("Hofer Decl.")) Exs. 47 (Deposition of Linda Anne Richter, dated May 23, 2006 ("Richter Dep.")), 48 (Deposition of Karen Andrews, dated June 27, 2006 ("Andrews Dep.")), 49 (Deposition of Carol Maffei, dated June 27, 2006 ("Maffei Dep.").) Karen Andrews stated the following in her deposition:

> Q:      Okay.  Did any – in this time frame[,] 2000 to 2003, did any nurse over at Morristown Memorial tell you that in order for a St. Clare's patient to obtain a bed over at Morristown Memorial, St. Clare's had to use as a transport team [AAC] or Rural Metro Ambulance?
>
> A:      Yes.
>
> Q:      And how often did that happen?
>
> A:      I can testify to definitely two times. . . .

*      *      *

_____

[4] Plaintiff also submits the declarations of Pamela Hinman and Donna Worflar in support of its tying allegation.  (Decl. of Pamela Hinman ("Hinman Decl.) ¶¶ 20, 25; Decl. of Donna Worflar ("Worflar Decl.") ¶ 27.)  Specifically, the portions of the declarations of Hinman and Worflar are cited by Plaintiff for the proposition that John Guerrero, of Saint Clare's, and Dr. David G. Mattes, M.D., of Newton, told Hinman and Worflar that MMH was conditioning access to beds on the use of AAC for SCT.  (Id.)  These statements are clearly hearsay.  Whether an exception to the hearsay rule applies, and would lead ultimately to admissibility and consideration of these statements, need not be addressed at this time, as the other evidence produced by Plaintiff is sufficient to overcome Defendants' motion for summary judgment.

9

Q:     And what exactly did [the MMH employee] tell you in these two instances that you specifically remember whereby you were told that the St. Clare's patient had to be transported by the ambulance company [MMH] selected in order for the patient to get a bed at [MMH]?

A:     She said [that] in order for her to give me a room assignment, that [AAC] had to pick up the patient, that that's just – that was their rules.

Q:     When she said that was their rules, did you ask her what she meant by that?

A:     I didn't ask her what she meant by that.  I asked her if that was in writing.  And she said "I'm sure it is, but I don't have it here in front of me."

And my patient was very sick and I didn't have time to argue with her.  I wanted – my patient was critical and I needed to get the patient over there.  I needed a room assignment.  I wanted to do what was best for my patient . . . . And I just said "Fine.  Just, you know, come pick the patient up."  And she called me back a few minutes later with a room assignment and a phone number . . . .

(Hofer Decl., Ex. 48 (Andrews Dep.) 20:16-22:8.)

Carol Maffei testified generally as to the policy:

Q:     During this second call you had with Joanne, did she say anything about, when you sort of questioned why Atlantic had to do the run, did Joanne have any response, something to the effect of that was policy or that it was a written policy to do it that way?  Did she offer you any explanation like that?

A:     Just, like I said before, that it was the policy that Morristown picked up the patients.

(Hofer Decl., Ex. 49 (Maffei Dep.) 44:25 to 45:8.)  Maffei also testified as to specific instances

where MMH refused to, or delayed, providing a bed to a patient where AAC was not the SCT

provider:

Q:     Now, during the time frame 2001 or 2000 to 2003 . . . did you ever have any telephone conversations with anyone at [MMH] whereby the person talking to you from Morristown told you that if St. Clare's wanted to have a bed for the patient at [MMH], that [AAC] would have to do the ambulance run?

A:    Yes.

Q:    Did that happen on more than one occasion?

A:    Yes.

Q:    How many occasions did that happen on?  How many occasions did that take place?

A:    Three that I can recall the full case.

Q:    Three what?

A:    That I can recall the full situation, the case of what happened.

(Hofer Decl., Ex. 49 (Maffei Dep.) 9:12 to 10:4.)  Maffei provided her specific recollections of

the instances, similar to those provided by Andrews, where a bed was denied unless AAC was

used as the transport.  (Hofer Decl., Ex. 49 (Maffei Dep.) 34:3 to 43:9.)

Linda Richter testified that she also experienced making calls to MMH and receiving the

mandate that beds would only be available if AAC did the SCT:[5]

Q:    Okay.  Did there ever come an occasion when someone at Atlantic said – for example, this nurse when you are talking about bed availability, said something to the effect that a bed wouldn't be available unless [AAC] did the run?

A:    Yes, they did say that to us.

Q:    When did they say that?

A:    When we would call to arrange for a patient to be received by their facility.

Q:    So they did say that, in order to get this bed in a timely fashion, you had to

---

[5] Although Linda Richter has subsequently changed her testimony, this Court may still consider her original deposition testimony in analyzing whether Plaintiff demonstrates that a genuine issue of material fact exists because the changing testimony ultimately goes to her credibility.  See Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999); SEC v. Koracorp Indus., Inc., 575 F.2d 692, 699 (9th Cir. 1978).

use [AAC] to do the transport?

A:      Correct.

(Hofer Decl., Ex. 47 (Richter Dep.) 78:25 to 79:13.)  Richter testified that MMH would relent on

this ultimatum when pressed, however.  (Hofer Decl., Ex. 47 (Richter Dep.) 79:16 to 80:3.)

Plaintiff also produces circumstantial evidence of a formal tying arrangement.  In the

report prepared by Patrick Gaughan, Ph. D., Med Alert's economic expert (the "Gaughan

Report"), the chart reflecting his analysis of SCT to MMH demonstrates that Saint Clare's own

ambulance company did no SCT runs to MMH in 2001 and 2002.  (Hoffer Decl. Ex. 32

(Excerpted Table from the Gaughan Report).)  The chart also reflects that the ambulance

company for St. Clare's did not resume runs to MMH until after 2004.  (Id.)

Defendants argue that this testimony is insufficient to satisfy the element of a tying

violation because it does not demonstrate a formal tying arrangement or any coercion.  As to the

issue of whether the instances constitute a formal tying arrangement, Plaintiff has not uncovered

any written evidence of the alleged tying policy, at present.  However, the instances set forth by

the three nurses are sufficient to demonstrate, at least for the purposes of a summary judgment

motion, a formal, if not written, policy of conditioning the availability of beds, or tertiary hospital

services, on the use of MMH's ambulance company, AAC.  This testimony creates a genuine

issue as to a material fact such that a juror could reasonably find that a formal tying arrangement

existed.

Defendants' failure to demonstrate that there are no genuine issues as to a material fact

regarding whether a tying arrangement existed, requires this Court to consider the per se and rule

of reason theories.

12

B.    Per Se Theory

Defendants also challenge Plaintiff's Section 1 claims for failure to define adequately the tying market under the per se theory.  "Under the per se analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share[, or market power,] in the tying product market, and (3) a substantial amount of interstate commerce is affected."  Gordon v. Lewistown Hosp., 423 F.3d 184, 214 (3d Cir. 2005).[6]  Defendants contest the latter two elements of the per se liability test.  This Court will first address the second element, whether Defendants possess market share in the tertiary hospital services market.

To determine whether market power exists, this Court must first define the relevant tying product market, and then determine whether MMH has power over price in that market.  See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 (3d Cir. 1992).  "A market has two components, product and geographic[, and] the burden is on the plaintiff to define both components of the market."  Brokerage Concepts, 140 F.3d at 513.

The Supreme Court has noted that courts typically find sufficient economic power in the tying market to condemn tying arrangements per se when the defendant's share of the market is so high that it occupies a dominant market position.  Town Sound, 959 F.2d at 479 (citing Jefferson Parish, 466 U.S. at 16-17).

In defining the relevant tying market, Plaintiff relies heavily on the expert report of Dr.

---

[6] Gordon describes the second element of the per se rule using the term "market share."  In previous Third Circuit precedent, this concept was referred to as "market power."  See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 512-13 (3d Cir. 1998) (stating the second element as "the seller must possess *market* power in the tying product market," (emphasis added)) (citing Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 (3d Cir. 1992)).  As the precedent treats these terms (market share and market power) interchangeably, this Court will do so, as well.

Patrick Gaughan, Ph. D., who, in turn, relies heavily on the representations made to him by Kate Concannon.  As set forth later, it is appropriate for an expert to rely on industry specific facts, as gathered in interviews with persons familiar with that industry, when defining relevant product and geographic markets.  Gaughan can rely on Concannon, a veteran of the SCT business of twenty years, to determine the relevant product and geographic markets.  See, e.g., ID Sec. Systems Canada, Inc. v. Checkpoint Systems, Inc., 198 F. Supp. 2d 598, 615 (E.D. Pa. 2002) (finding admissible for trial the testimony of an economic expert based not on market surveys, but on interviews with industry participants and reviewing industry forecasts created by another entity).  Gaughan cannot rely on the representations of Ms. Concannon in determining the market for tertiary care, however.

Plaintiff's primary evidence, aside from the representations of Ms. Concannon, as set forth in her affidavit, of what they consider capable of creating a relevant geographic market for tertiary care services is three market studies created by companies hired by AHS.  One study, conducted in 1998 by APM Management Consultants/CSC Health Care (the "APM Report"), concluded that MMH had a 23% share of the market for tertiary care in the eleven counties of Northern New Jersey (Sussex, Warren, Hunterdon, Somerset, Middlesex, Union, Essex, Hudson, Bergen, Passaic, and Morris).  (Hofer Decl. Ex. 17 (Slide Show of Study created by APM Management Consultants/CSC Health Care, dated July 30, 1998) at CSC 0187-89.)  The same study concluded that MMH had 51% of the market for cardiac surgery.  (Id.)

A second study, created by SG2, Inc., examines MMH's market share along different geographical lines (the "SG2 Report").  (Hofer Decl. Ex. 18 (Slide Show of Study created by SG2 Health Care Intelligence, undated).)  The SG2 Report drew two lines to delineate market

areas for MMH.  The first, indicated as the Primary Service Area, is made up of mostly western and southern Morris County.  The second, indicated as the Secondary Service Area, is made up of nearly all of the rest of Morris, Sussex, and Warren Counties, as well as some of northern Passaic County.  (Id. at AHS 4423.)  The combined market share of MMH in this combined geographic area was 35.5%.

A third study, completed using a service called Solucient Data, indicates that for the cardiac services submarket, MMH maintained a range of 12% to 100% market share, depending on the type of cardiac care involved and the specific zip code.  (Hofer Decl. Ex. 19 (Report created by Solucient Data, undated).)

Dr. Gaughan considered these studies in his analysis of the "Market for Tertiary Care in Northern New Jersey."  (Decl. of Paul H. Saint Antoine ("Saint Antoine Decl.") Ex. 10 (Report created by Economatrix Research Associates, dated June 6, 2005 and authored by Patrick A. Gaughan, Ph. D. ("Gaughan Report") at 18.)  In analyzing the study conducted by APM, he states that AHS has a "dominating share" in two of the 11 counties (a 40% share in Morris County and a 52% share in Sussex County).  (Saint Antoine Decl. Ex. 10 (Gaughan Report) 18.)  However, Dr. Gaughan did not conduct an independent study of the tertiary care market.  (Saint Antoine Decl. Ex. 12 (Dep. of Patrick A. Gaughan, Ph. D., dated July 17, 2006) 140:18-23.)

Gaughan also makes no attempt at setting out the geographic boundaries of the tertiary care market.  (Id.)  In his deposition Gaughan stated:

Q:     As part of your expert report in this matter[,] have you undertaken any independent economic analysis of what the relevant hospital service markets are in New Jersey?

A:     No.

> Q:      And is that true for both what we talked about earlier as the product market
>         and the geographic market?
>
> A:      That's correct.

(Id.)

### 1.      Tertiary Care Services Market

Despite the failure to provide an independent economic analysis, the studies, and

Gaughan's analysis of these studies, provide a reasonable juror sufficient information to create a

geographic market.  But, this evidence does not demonstrate that MMH has "market power"

within that geographic area.  From the evidence Plaintiff sets forth, this Court can perceive three

possible relevant geographic markets for tertiary care services: 1)  the eleven counties designated

in the APM Report as Northern New Jersey; 2) the combined primary and secondary markets

outlined in the SG2 Report; and 3) the two county area highlighted by Gaughan in his expert

report (Sussex and Morris Counties).

In Times-Picayune Publishing Co. v. United States, an early Supreme Court case on tying

arrangements, the Supreme Court held that a newspaper which held a 40% market share did not

occupy a "dominant" position in the newspaper advertising market.  345 U.S. 594, 611-13

(1953).  In so holding, the Supreme Court reasoned that:

> Obviously no magic inheres in numbers; 'the relative effect of percentage command
> of a market varies with the setting in which that factor is placed.'  If each of the New
> Orleans publications shared equally in the total volume of linage, the Times-Picayune
> would have sold 33 1/3%; in the absence of patent or copyright control, the small
> existing increment in the circumstances here disclosed cannot confer that market
> 'dominance' which, in conjunction with a 'not insubstantial' volume of trade in the
> 'tied' product, would result in a Sherman Act offense under the rule of International
> Salt.

<u>Times-Picayune</u>, 345 U.S. at 612-613 (internal citations omitted).

Here, for the tertiary care services market, Plaintiff has given this Court no context within which the percentages in the varied geographic areas can be contrasted. In the area where AHS exerted the largest market percentage, the Sussex and Morris area (46% combined), Plaintiff makes no reference to MMH's competitors, where those competitors are located, and what the competitors market shares might be.

Only in one possible geographic area, the geographic area defined by the APM Report, does Plaintiff provide market shares – one pie chart reflects competitors and their market shares. (Hoffer Decl. Ex. 17 at CSC 0188 (listing the following names and percentages on the pie chart: Moutainside – 1%; Overlook – 7%; Passaic – 0%; Dover General 7%, St. Barnabas Medical Center – 11%; Somerset – 7%; St. Clare's – 14%; Other – 30%).)[7] No other reference is made to these market shares. On this chart, MMH has a 23% market share. Combined with Mountainside and Overlook, two hospitals owned by AHS, the market share for AHS is 31%. Based on the amount of competition and the percentage held by competitors, this Court cannot determine market power in the area defined by the APM Report.

The SG2 Report includes a map with other hospitals, but does not give market share percentages for those hospitals. (Hofer Decl. Ex. 18 at 11.) Finally, the Solucient Data report gives market share percentages for competition in various zip codes. However, this data is for cardiac surgery.[8] Further, even if this data addressed the tertiary care services market, Plaintiff

---

[7] Mountainside and Overlook are not competitors, as they are part of the AHS network of hospitals.

[8] Plaintiff also attempts to define a market for cardiac surgery to demonstrate that AHS exercised dominant market power over a tying product or service. This theory fails, however,

17

fails to draw any connection between these zip codes and a definable geographic market.

In the geographic area defined by the APM Report, the market share data does not reflect MMH or AHS holding a dominant market share.  This Court cannot determine whether AHS's market share for tertiary care services was dominant without this information.  As such, Defendants have demonstrated that there is an absence of evidence to support Plaintiff's claim of a tying violation under the per se rule.

C.    Rule of Reason Theory

Because this Court has found, as a matter of law, that Plaintiff has not demonstrated a tying violation under Section 1 of the Sherman Act using the per se theory, this Court must now address whether Plaintiff can assert such a claim under the rule of reason theory.[9]  See Jefferson Parish, 466 U.S. at 31.

Under the rule of reason theory, the plaintiff must establish that the "'challenged action had an actual adverse effect on competition as a whole in the relevant market.'"  Tops Markets,

_____

because Plaintiff has demonstrated the evidence of a tying violation between tertiary care services and SCT services.  While Plaintiff does show evidence of market power in some zip codes, the tying violation alleges that tertiary care services were withheld, and not that care for patients needing cardiac surgery specifically was withheld.

[9] Plaintiff also asks this Court to consider its tying claim under the so-called "quick look" test, set forth in California Dental Ass'n v. Federal Trade Comm'n, 526 U.S. 756, 779 (1999).  The quick look test, which falls somewhere in between the per se test and the rule of reason, requires "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  Id. at 770.  Thus, under the quick look test, a plaintiff can bypass the threshold industry analysis.
Plaintiff argues that this tying arrangement, the requirement that a sending hospital or patient use AAC before MMH will provide a bed assignment for tertiary care, is obviously anticompetitive.
Because Plaintiff can bring its claim under the rule of reason analysis, and further because the issue of the "quick look" test was not challenged by Defendants, this Court declines to employ the quick look test at this time.

Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998) (quoting Capital Imaging

Associates. v. Mohawk Valley Med. Associates., Inc., 996 F.2d 537, 541 (2d Cir. 1993)).  "[T]o

make out a rule of reason claim, a plaintiff need not make the same showing of tying market

power that is necessary as a prerequisite to a 'per se' claim."  Town Sound, 959 F.2d at 483.

Indeed, no showing of tying market power is required under a rule of reason analysis.  Town

Sound, 959 F.2d at 483.  As under the per se theory, this Court must define the relevant

geographic and product markets.  See Gordon, 423 F.3d at 211.  Under the rule of reason

analysis, however, the tied product's market is analyzed.  Id.

Here, Plaintiff argues that the relevant product market is SCT ambulance runs.  Plaintiff

argues that the relevant geographic market is northwest New Jersey, or, the individual SCT

ambulance runs between Newton, St. Clare's, and Hackettstown, and MMH.  Defendants argue

that Plaintiff has "gerrymandered" a geographic area in order to create an impression of a broader

impact of Defendants' actions.  (Memorandum of Law of Defs. AHS and AAC in Support of

Their Motion for Summary Judgment ("Defs.' Br.") 10.)  The evidence produced by Plaintiff,

Defendants argue, lacks the necessary economic support to define these markets.

Defendants rely on the deposition testimony of Dr. Gaughan for the proposition that

Plaintiff has done no economic analysis sufficient to substantiate any relevant product or

geographic market.  Defendants argue that Gaughan adopted the product definition given by Med

Alert's President, Kate Concannon:

> Q:  As part of your work in this matter, Dr. Gaughan, did you undertake analysis
> to determine what the relevant market was, or did you simply assume for
> purposes of your analysis what that relevant market was?
>
> A:  Well, these are the markets as perceived by Ms. Concannon the way that she

conducts her business.

(Saint Antoine Decl. Ex. 12 (Dep. of Patrick A. Gaughan, Ph. D., dated July 17, 2006) 88:24 to

89:7.)  Dr. Gaughan made similar statements about the relevant geographic market.

Defendant argues further that Ms. Concannon's analysis of the relevant product and

geographic markets is equally inadequate.  Defendants cite no case law in support of their

position that an economic expert cannot rely on the representations made during interviews with

persons familiar with the industry.  An analysis of Ms. Concannon's declaration reflects

sufficient evidence upon which Gaughan could rely, and sufficient evidence to present a genuine

issue of material fact for the jury's resolution, as to the relevant geographic and product markets.

### 1.        Relevant Product Market

"The test for a relevant market is not commodities reasonably interchangeable by a

particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same

purposes.'"  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3d Cir. 1997)

(referring to the test regarding relevant markets under Section 2 of the Sherman Act) (quoting

United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)).  "The relevant

geographic market, from which the court calculates the market share in the relevant products

markets, is that area in which a potential buyer may rationally look for the goods or services he

seeks."  Gordon, 423 F.3d at 212.  "The boundaries of such a submarket may be determined by

examining such practical indicia as industry or public recognition of the submarket as a separate

economic entity, the product's peculiar characteristics and uses, unique production facilities,

distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  Brown

Shoe Co., Inc. v. United States, 370 U.S. 294, 325 (1962).

Here, Ms. Concannon's declaration provides an industry opinion of SCT as a separate economic entity.[10]  SCT is the highest level of medical care administered during transport of a patient in an ambulance.  (Id. ¶ 8.)  During an SCT run, the patient must receive the same level of treatment that he was receiving in the sending hospital.  (Id. ¶ 8.)  Ambulances providing SCT services must be staffed by two emergency medical technicians ("EMTs") and one registered nurse.  (Concannon Decl. ¶ 8.)

The level of care required by SCT dictates the choices of the parties involved with such a transport.  (Id. ¶ 10.)  The patient cannot choose to use a lesser level of care, such as a basic life support transport, if the sending hospital dictates that the level of care should be SCT.  (Id. ¶ 10.)  SCT usually occurs from one hospital to another hospital, specifically from a community based hospital ("CBH"), which provides initial care to stabilize the patient, to a tertiary care hospital, which can provide more advanced levels of care.  (Id. ¶ 11.)

The nature of SCT dictates whether they can be a relevant product market.  First, by definition, the "industry or public recogn[izes SCT] as a separate economic entity."  SCT is not interchangeable with any other services on the ground.  (Id. ¶ 10.)

Further, SCT has "peculiar characteristics and uses."  See Brown Shoe, 370 U.S. at 325.  The level of care required for the patient dictates whether SCT is used.  The service is ordered in certain, specific circumstances: where a CBH needs to transport a patient at a certain level of care

_____

[10] Ms. Concannon's declaration is valid evidence and can be used in determining whether Plaintiff has demonstrated that a genuine issue as to material fact exists regarding the relevant product and geographic markets.  Much of what Ms. Concannon testifies regards knowledge of the ambulance services industry.  Ms. Concannon's experience, as CEO of Med Alert for 20 years gives her an intimate knowledge of the ambulance industry, and, therefore, her testimony on what SCT is and how it works can reasonably be relied upon by Gaughan in his analysis.

to a tertiary care hospital.

SCT requires "specialized vendors," in that they need ambulance companies that can provide two EMTs and a registered nurse, as well as an ambulance that can provide a specific level of care. See Brown Shoe, 370 U.S. at 325. Finally, SCT has "distinct customers." The only persons who can order this service are sending hospitals and patients.

The details set forth in Ms. Concannon's declaration, regarding how SCT works, are sufficient to demonstrate that there is a genuine issue as to material fact regarding the relevant product market. A reasonable juror could find a relevant product market of SCT services from the evidence produced.

### 2.    Relevant Geographic Market

"The purpose of the search for the relevant geographic market is to find the area or areas to which a potential buyer may rationally look for the goods or services that he seeks." United States v. Grinnell Corp., 384 U.S. 563, 588 (1966). "[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991), cert. denied, 505 U.S. 1221 (1992)). . The definition of a geographic market "cannot be performed with mathematical accuracy; it is simply the recognition of the field in which meaningful competition is said to exist." Forsyth v. Humana, Inc., 114 F.3d 1467, 1475-76 (9th Cir. 1997) (citing United States v. Continental Can Co., 378 U.S. 441, 449 (1964)), aff'd, 525 U.S. 299 (1999). "The geographic scope of a relevant product market is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry being considered." Gordon, 423 F.3d at 212 (citing Borough

of Lansdale v. Philadelphia Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982)).

This Court finds that there exists a genuine issue as to a material fact regarding the proper scope of the relevant geographic market inquiry that cannot be decided as a matter of law, pursuant to this motion for summary judgment. Plaintiff's expert relied on the opinions of Kate Concannon in defining the geographic market. (Concannon Decl. ¶ 6.) But, he also relied on medical protocols governing the transport of SCT patients and mandated response times to which SCT ambulance companies must adhere. (Id. ¶ 6.) For instance, when a patient suffers an emergency, or needs a higher level of care, which a tertiary care hospital can provide, the patient's transportation choices are driven by his current location and the location of the tertiary care hospital. (Id. ¶ 6.) A patient in Newton in need of SCT to MMH cannot be transported to New York Presbyterian as a substitute because such a transport would violate the standard of care and medical protocols. (Id. ¶ 7.)

Gaughan also took into account the decision-making process which goes into the actual decision to select a SCT provider. (Id. ¶ 7.) When a medical professional at a community based hospital determines that a patient needs to be transferred to a tertiary care facility, a decision regarding which facility (and which specialists at that facility) will be used, is made prior to the consideration of the vendor of SCT services. Thus, an SCT vendor will get a specific call regarding transport to a specific hospital. (Id. ¶ 7.) SCT providers are chosen for specific routes.

Gaughan concluded based on these facts and industry standards, gleaned from interviews with Ms. Concannon, that the three separate ambulance routes, Newton to MMH, St. Clare's to MMH, and Hackettstown to MMH, each constitute a geographic market because a patient has no ability to choose a substitute for MMH, which is the nearest tertiary care hospital. (Id. ¶ 8.)

As there is an issue of fact as to the threshold definition of what constitutes the relevant geographic market, this Court will next analyze whether, under the rule of reason, Plaintiff has demonstrated that a genuine issue of material fact exists regarding whether the tying arrangement has had an adverse effect on competition.  See Gordon, 423 F.3d at 210.

### 3.     Adverse Effect on the Tied Product

This Court has determined that Plaintiff's proposed definitions of the relevant product and geographic markets survive summary judgment.  This Court must now analyze the adverse effect on competition based on these markets.

Under the rule of reason theory, plaintiff must establish that "the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets."  United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993) (citing Tunis Bros. Co., 952 F.2d at 722).  "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services."  Brown Univ., 5 F.3d at 668 (internal citations omitted).  Because such proof is often difficult to produce, "courts typically allow proof of the defendant's 'market power' instead.  Id.  "Market power, the ability to raise prices above those that would prevail in a competitive market, is essentially a 'surrogate for detrimental effects.'"  Id. (internal citations omitted).

Med Alert has presented evidence of a decrease in competition in the market for SCT ambulance services.  After Defendants initiated the alleged tying program, two SCT providers that serviced the three SBT service routes (Newton to MMH, St. Clare's to MMH, and Hackettstown to MMH) have exited these markets.  (Concannon Decl. ¶ 16; Hofer Decl. Ex. 40

(Deposition of James Loures, dated April 4, 2006) 20:18 to 21:18, 35:3-4, 35:24 to 36:4;

Gaughan Decl. Ex. C (indicating no market shares for Rural Metro and Med Alert after the time

of the alleged tying arrangement for two of the three routes).)

Med Alert has also demonstrated that AAC's market share has increased, after the alleged

tying, to monopolistic levels.  In 2004, AAC held a market share of 100% of the Newton to

MMH route, 83.96% of the St. Clare's to MMH route, and 80% of the Hackettstown to MMH

route.  (Gaughan Decl. Ex. C (Gaughan Supplemental Analysis).)

Plaintiff submitted analysis of AAC's billing procedures which demonstrate how AAC,

which now holds a large share of the market, has increased prices.  After Med Alert exited the

markets, AAC increased the price of non-emergency SCT from $1200 to $1500 per transport.

(Concannon Decl. ¶ 62 Ex. 30 (Chart Comparing Prices of Med Alert to AAC, created by Kate

Concannon).)[11]  AAC also increased the per mileage charge for patients because a) AAC charged

$15, whereas Med Alert charged $11, and b) the number of total miles for each of these routes

was longer for AAC, than it was for Med Alert.  (Id.)

Med Alert also produced evidence of shifting non-reimbursable insurance costs to the

patient on the Newton to MMH route.  (Concannon Decl. ¶¶ 61-64.)  AAC did so by reducing the

charge to Newton for transports, but then billed the reduced amount to the consumer as a non-

reimbursable insurance charge.  Two patients filed declarations attesting to these charges in the

amounts of $162.95 and $176.  (Declaration of Edward J. Skrocki ("Skrocki Decl.") ¶ 4, Ex. A;

---

[11] AAC did not increase its price for emergency transports, which was actually lower than
Med Alert's price.  (Id.)

Declaration of Joan Waldron ("Waldron Decl.") ¶4, Ex. A.)[12]

The evidence outlined above is sufficient to create a genuine issue of material fact as to whether the tying arrangement resulted in an "actual adverse effect" on competition.  Plaintiff also submits the declarations of four patients who expressed dissatisfaction with the level of service provided by AAC, but this Court need not detail those complaints as the evidence outlined above is sufficient to survive summary judgment.[13]

Plaintiff does not demonstrate any genuine issues of material fact which would support a claim of a tying violation of Section 1 of the Sherman Act under the per se theory.  This Court has determined that there are genuine issues of material fact sufficient to support a claim of tying, under Section 1 of the Sherman Act, applying the rule of reason theory.  Thus, Defendants' motion for summary judgment is denied as to Counts I and VI of the Complaint.

## III.   <u>Monopolization Claims Under Section 2 of the Sherman Act</u>

Counts II through V and Counts VII through X assert claims of monopolization under Section 2 of the Sherman Act or the equivalent provisions of the New Jersey Antitrust Act. Defendants argue that Plaintiff cannot maintain these claims because a) Plaintiff failed to establish relevant product and geographic markets, and b) the actual number of ambulance

---

[12] Defendants challenge the declarations of Skrocki and Waldron as speculative and immaterial.  Defendants' challenge is based on the immateriality of these persons' preference of SCT providers.  This Court cites to the declarations because they provide admissible evidence of instances of increased prices for SCT, as outlined by Kate Concannon in her declaration.

[13] The evidence set forth by Plaintiff to demonstrate an actual adverse effect on competition is also sufficient, under the standard set forth in <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, to demonstrate an "injury of the type the antitrust laws were intended to prevent."  429 U.S. 477, 489 (1977).  Defendants' challenge to this aspect of Plaintiff's antitrust claims, set forth in Section I of Defendants' brief in support of this motion, is denied.

companies grew in New Jersey during this time period.

The analysis of relevant product and geographic markets for Section 1 matches that for Section 2 claims.  As set forth above, supra Section I, regarding the tied product market, this Court finds that Plaintiff has set forth evidence of relevant product and geographic markets which is sufficient to survive this summary judgment motion.  As to its second argument, the plausible relevant product and geographic markets that this Court observed from the evidence are SCT services on three specific routes.  The evidence that the number of ambulance companies that provide any level of transportation grew for the entire state is not sufficient to derail Plaintiff's monopoly claims because it addresses too broad a market definition, i.e., SCT and BLS ambulance services.  Thus, the entries into the market which Defendants wish to use as evidence against Plaintiff's monopolization claims are not relevant.  Defendants' motion for summary judgment on Counts II to V and Counts VII to X is denied.

**IV.    Tortious Interference Claims**

Plaintiff also raises several tortious interference claims in its Complaint.  Count XI alleges tortious interference by Defendants with Plaintiff's contract with Newton.  Count XII alleges tortious interference with Plaintiff's contract with St. Clare's.  Count XIII alleges tortious interference with Plaintiff's prospective economic benefit with Hackettstown.

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation." Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 305 (2001) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 750 (1989)).  "Under New Jersey law, the five elements of a claim of tortious interference with a prospective business relationship are: (1) a

plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 186 (3d Cir. 1992) (citing Printing Mart-Morristown, 116 N.J. 739 (1989)). A claim for tortious interference with a contract requires the same elements as a claim for tortious interference with a prospective business advantage, with the additional element that a contract must be proved. Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 256 F. Supp. 2d 249, 288 (D.N.J. 2003) on remand from, 227 F.3d 62 (2000).

Defendants argue that Plaintiff has failed to demonstrate a genuine issue of material fact as to several elements of tortious interference claims. Defendants argue that Plaintiff has not provided sufficient evidence 1) of malice, or intentional interference; 2) which demonstrates that Defendants had knowledge of the contracts involved; 3) that demonstrates a reasonable expectation of economic benefit from Hackettstown; and 4) that Defendants were the cause of the loss of the contracts. For the reasons stated below, this Court denies Defendants' motion for summary judgment as to Counts XI, XII, and XIII.

A.   Malice

"For purposes of this tort, '[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff.'" Printing Mart, 116 N.J. at 751 (quoting Restatement (Second) of Torts Chapter 37 at 5 (introductory note) (1979)). "Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Id.

28

This Court need not make an in depth analysis of malice, as Defendants argue essentially that they possessed an "equal or superior right" to the SCT runs. (Defs.' Br. 24.) Defendants cite to Herbert v. Newton Memorial Hosp., 933 F. Supp. 1222, 1229-30 (D.N.J. 1996) in support of this argument. Defendants argue that a hospital has "broad discretionary powers in managing [its] affairs" such that a court will generally not interfere with the hospital's decision "when the hospital acts reasonably for the public good." Id. at 1235. Defendants attempt to stretch this principle to include a "right to have a say in the manner in which patients are brought to MMH." (Defs.' Br. 25.)

This argument ignores the crux of Plaintiff's claims. As set forth above, Plaintiff presents evidence of a tying arrangement by which MMH allegedly withheld beds to patients who did not consent to use of AAC. (See supra Section II, A.) This Court need not delve into the other evidence set forth by Plaintiff of other means of diverting calls for SCT from Med Alert. The evidence of the tying arrangement establishes, at the very least, that MMH's actions cannot have been for the public good, as a matter of law. Further, based on the evidence set forth by Defendants, it is not apparent that a receiving hospital has some superior right in choosing an SCT services provider. The process of how SCT is arranged belies that fact. (See supra Section II, B, 2 at 18.)

Defendants base their attack on the sufficiency of Plaintiff's evidence of malice solely on their "superior right" argument. Assuming that such a superior right exists in the context of SCT, the evidence presented of a tying arrangement is sufficient to defeat this argument, and presents a genuine issue of material fact. Defendants' motion for summary judgment on this ground is denied.

B.     Knowledge of the Contracts

"[I]t is axiomatic that a defendant cannot be liable for interfering with a contract of which

he or she was unaware."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1170 (3d Cir. 1993).

Defendants argue that Plaintiff has provided no evidence that MMH or AAC had knowledge of

the contracts between Med Alert and Newton and Med Alert and St. Clare's.  Defendants present

deposition testimony of MMH and AAC employees who testify that they did not know of any

such contracts.  Defendants' argument is rejected.

Plaintiff presents evidence that in early June 1999, Kate Concannon informed two

employees of MMH of the contracts with both Newton and St. Clare's during a visit by the two

employees to Med Alert's facility.  (Concannon Decl. ¶¶ 33-34.)  Plaintiff also provides evidence

that the contracts were disclosed to AAC executives during a meeting between Med Alert,

Newton, and AAC.  (Concannon Decl. ¶¶ 35-36; Hinman Decl. ¶ 10.)  Further, in July 2001,

Clinton Ackerman, an executive for Newton, forwarded the contract between Med Alert and

Newton, excluding prices, to AAC executive Richard Donovan.  (Hofer Decl. Ex. 37 (Deposition

of Clinton Ackerman, dated August 9, 2005) 204:8 to 205:22.)  Finally, in December 2001, Kate

Concannon informed Kitty Welsh, an Atlantic executive, of Med Alert's contract with St.

Clare's, including its primary terms.  (Concannon Decl. ¶ 37.)

Defendants have failed to demonstrate to this Court that there is an absence of evidence

to support the allegations of knowledge.

C.     Reasonable Expectation of Business with Hackettstown

The claim of tortious interference with an expected business advantage must contain

"allegations of fact giving rise to some 'reasonable expectation of economic advantage.'"

Printing Mart-Morristown, 116 N.J. at 751 (quoting Harris v. Perl, 41 N.J. 455, 462 (1964)  "[A] plaintiff must specify some reasonable expectation of economic benefit or, in other words, the existence of a contract or the likelihood that a contract with a particular party would have been actualized but for the defendant's wrongful intercession."  Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co., 912 F. Supp. 747, 774 (D.N.J. 1995).  "A complaint must demonstrate that a plaintiff was in 'pursuit' of business."  Printing Mart, 116 N.J. at 739. Defendants argue that Plaintiff fails to produce any evidence of a reasonable expectation of economic advantage.

Gaughan, in his Supplemental Report, dated November 3, 2005, sets forth his analysis of the market shares of SCT runs from 2000 to 2004.  (Gaughan Decl. Ex. C.)  In 2000, Med Alert did 89 runs from Hackettstown to MMH, which translates to 73.55% of the market.  Following the alleged acts of tortious interference, the number of runs was 4, in 2003.  (Id.)  This constituted 1.97% of the market.  (Id.)  Plaintiff submits no other evidence of expected business benefit.

However, "without searching far, courts have succeeded in finding a reasonable expectation of economic benefit."  Printing Mart, 116 N.J. at 753.  Courts have found a reasonable expectation of economic benefit for 1) an independent maker of cemetery markers wishing to sell to the general public; 2) a prospective seller to the public of goods on consignment; 3) a blacksmith for sale of his services to the general public; and 4) real estate brokers who introduced a buyer and seller of a specific property.  See Printing Mart, 116 N.J. at 754.

It is reasonable, based on the amount of business Plaintiff received from Hackettstown in

the years before the alleged tortious acts, for Plaintiff to expect a similar amount in the future. This evidence is sufficient to create a genuine issue of material fact as to whether Plaintiff had a reasonable expectation of economic advantage with Hackettstown.  Defendants' motion for summary judgment is denied as to Count XIII of the Complaint.

        D.    <u>Causation</u>

"A plaintiff shows causation when there is 'proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.'"  <u>Printing Market</u>, 116 N.J. at 759 (quoting <u>Leslie Blau Co. v. Alfieri</u>, 157 N.J. Super. 173, 185-86 (N.J. Super. Ct. App. Div. 1978)).  Defendants argue that the alleged interfering conduct was not the reason for Newton or St. Clare's to terminate the contracts with Med Alert.  Defendants argue that a specific incident, which occurred in January 2003, with a Newton patient resulted in Newton's loss of confidence in Med Alert.  Clint Ackerman, a Newton executive, testified that Med Alert was the front runner for the contract prior to this incident.  Defendants argue that St. Clare's decided not to renew its contract with Med Alert because St. Clare's vertically integrated SCT ambulance services into its overall operation.

Defendants' arguments are more appropriate for trial.  Defendants do not allege, correctly, that Plaintiff fails to produce any evidence of causation.  Instead, they provide evidence of other possible reasons for Med Alert's loss of the contracts.  This Court's function on a motion for summary judgment is to determine whether Plaintiff has presented any genuine issues of material fact.  It is not this Court's function to determine which set of facts presented is better, or more reasonable.

Defendants fail to demonstrate that Plaintiff offers no genuine issue of material fact as to the issue of causation.  Defendants' arguments for summary judgment based on the elements of malice and knowledge of the contracts between Med Alert and Newton and Med Alert and St. Clare's, as set forth above, also fall short.  Defendants' motion for summary judgment as to Counts XI and XII are denied.

## **CONCLUSION**

Pursuant to their Section 1 claims, Plaintiff failed to demonstrate market power for any possible geographic market for tertiary care services that can be gleaned from the evidence. Therefore, Plaintiff cannot pursue their Section 1 claims under a per se theory.  However, Plaintiff has demonstrated genuine issues of material fact as to all challenged elements of the rule of reason theory under Section 1.  Plaintiff can bring its Section 1 claim under the rule of reason theory, and, therefore, Defendants' motion for summary judgment is denied as to the Section 1 claim.

Plaintiff has demonstrated genuine issues of material fact as to all the challenged elements of their Section 2, tortious interference of business contract, and tortious interference with a prospective business advantage claims, as well.  For the foregoing reasons, and for the reasons set forth in the opinion above, this Court denies Defendants' motion for summary judgment.


  S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.


Dated: August 6, 2007

33